CRAIG H. MISSAKIAN
MARIANA AGUILAR
THOMAS H. KAO
AMUSEMENT INDUSTRY, INC.
6665 Long Beach Boulevard Suite B-22
Long Beach, California 90805
Tel: (310) 639-7130
Fax: (310) 639-1757
E-Mail: craig@westlandreg.com
E-Mail: mariana.a@westlandreg.com
E-Mail: thomas.k@westlandreg.com

ELISSA E. KOOLYK
LAW OFFICES OF ELISSA E. KOOLYK
575 Madison Avenue, 10th Floor
New York, New York 10022
Tel: (646) 401-0125
E-Mail: eliekoolyk@gmail.com

ALLEN P. SRAGOW
SRAGOW & SRAGOW
6665 Long Beach Boulevard Suite B-22
Long Beach, California 90805
Tel: (310) 639-0782
Fax: (310) 639-7210
E-Mail: a.sragow@sragowlawfirm.com

*Attorneys for Plaintiff Amusement Industry*

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| AMUSEMENT INDUSTRY, INC., doing business as Westland Industries, a California corporation, PRACTICAL FINANCE CO., INC., a California corporation, | ) ) ) ) ) **CASE NO. 11 CV 4416 (LAK) (GWG)** |
|  | ) **ECF CASE** |
| Plaintiffs, | ) ) **FIRST AMENDED COMPLAINT FOR:** |
| v. | ) **(1) Legal Malpractice;** |
|  | ) **(2) Breach of Fiduciary Duty;** |
|  | ) **(3) Negligent Misrepresentation;** |
| BUCHANAN INGERSOLL & ROONEY P.C., a Pennsylvania professional corporation, STEPHEN FRIEDMAN, an individual, | ) **(4) Fraudulent Inducement;** ) **(5) Fraudulent Concealment;** ) **(6) Constructive Fraudulent Inducement;** |
|  | ) **(7) Constructive Fraudulent Concealment; &** |
| Defendants. | ) **(8) Aiding & Abetting Conversion** ) |

Plaintiff Amusement Industry, Inc., dba Westland Industries, a California corporation, ("Amusement" or "Plaintiff"), by and through its attorneys, state their Complaint as follows:

<u>Introduction</u>

1.     Buchanan Ingersoll & Rooney P.C. ("BIR") and Stephen Friedman ("Friedman" collectively "Defendants"), a former shareholder of the law firm, represented Amusement in connection with a large real estate transaction in mid-2007 in which Amusement lost $13,000,000 and a real estate portfolio worth $190,000,000.  Rather than scrupulously protecting Amusement's interests in that transaction, Friedman misled Amusement, ignored basic tenets of professional responsibility, including a clear conflict of interest, and performed work that fell below even the lowest standards of professional care.  After Amusement lost its money, Friedman tried to cover up the misconduct with more misleading statements and, unbelievably, by counterfeiting a key document.

2.     In or about April 2007, Mark Stern ("Stern") signed a contract to buy a portfolio of shopping centers in the Southeastern United States ("the portfolio") from Colonial Realty Limited Partners ("Colonial") for approximately $130,000,000 ("the Colonial Transaction" or "the Colonial Deal").  Stern hired three law firms to represent him in the deal, including BIR. Stern himself had only a fraction of the funds necessary to close the large transaction and needed to find partners.  Friedman introduced Stern to Avery Egert ("Egert"), the son-in-law of wealthy real estate investor Joshua Safrin ("Safrin"), and later to Amusement as potential partners to help fund the deal.

3.     Friedman was a longtime, trusted friend and attorney for Allen Alevy ("Alevy"), who along with members of his family owns Amusement and its related companies.  Friedman had dated two of Alevy's daughters, been a close friend and rabbi to Alevy's son Steven, and,

most significantly, BIR and Friedman represented Amusement and the Alevy family companies in connection with, at least, two other real estate transactions, including one taking place simultaneously with the portfolio purchase. Through Friedman's knowledge of the Alevy family and their holdings, he knew that Amusement had the financial wherewithal to step in and supply the funds Stern needed.

4.    Initially, Alevy passed when Friedman presented the deal to him. Alevy did not know Stern or Safrin personally, did not like partnerships, and generally shied away from investing in areas of the country about which he had little knowledge. Without Amusement's money, however, Stern could not have done the deal on his own – and Friedman and BIR would most likely not have been paid. So Friedman persisted and eventually changed Alevy's mind, convincing him to wire $13 million into what Friedman said was an escrow account maintained by a national title company. As set forth in greater detail below, Friedman was able to do so only by misleading Amusement and concealing key facts about the transaction. Another attorney on the deal would say later that Friedman had concealed key facts from him as well – prompting a call to Friedman to find out "what the hell" had happened.

5.    As just one example, Friedman told Alevy that Safrin was also a partner in the deal and would make a substantial equity investment. Not only did Safrin's participation lend credibility to the deal, it was also material to Alevy because he wanted his son Steven to work with Safrin to learn the real estate business. In truth, Safrin had no money in the deal and Friedman had never personally spoken to him about the transaction – all of his communications had been with Egert. Even worse, Safrin now claims that his signatures on key documents, including a key document Friedman prepared and gave to Amusement, were forged. Without

Safrin in the deal, Amusement would not have put in 13¢ let alone $13 million – a fact well known to Friedman.

6.      As the deal progressed, Amusement became concerned about the safety of the $13 million it had wired because it did not have a partnership agreement signed with Stern and Safrin, and it had no intention of going forward without one.  So Amusement continued to press Friedman, who by that point was acting as if he represented all three sides – Amusement, Stern, and Safrin, to get a signed agreement.  Inexplicably, however, Friedman appeared to ignore the various draft partnership agreements that Amusement had prepared for his review.  He would admit later under oath that he had not even bothered to read them all.  As it turned out, Friedman had good reason to ignore the draft agreements because the 50/50 partnership he had sold to Amusement, and that the draft agreements reflected, was impossible under the terms of the loans Stern and Safrin had obtained to buy the portfolio – a key fact that Friedman concealed.  In fact, when Amusement asked Friedman for a copy of the loan documents he lied and said he did not have one.

7.      With no written partnership agreement in hand, Amusement finally asked to have its money returned days before the deal was set to close.  Unknown to Amusement, without its funds the deal could not have closed so Friedman stepped in to save the day – not for his client Amusement's benefit, but rather for the benefit of his other clients Stern and Safrin and for BIR.  This time, Friedman advised Amusement that taking back its funds would constitute a breach of contract and Stern and Safrin would sue Amusement for $60 million as a result.  Fearing a massive lawsuit and believing its money was safe for the time being, Amusement took Friedman's advice and allowed its money to remain with what it believed was a reputable title company.  In reality, it was not a title company at all but the bank account of Ephraim Frenkel

3

("Frenkel"), a previously-disbarred New York attorney.  This extra time was all that was needed to wrongfully convert the funds just days later.

8.      At the same time that Friedman advised Amusement against withdrawing its funds he also tried to calm its fears by offering to restructure the deal in a way, he claimed, fully protected Amusement's interest.  This new structure – what Friedman called "belt and suspenders" – generally involved transferring ownership and control of the portfolio to Amusement until Stern and Safrin paid Amusement back its $13 million.  If Stern and Safrin failed to pay Amusement, Amusement would keep the portfolio – and its $60 million in equity. Friedman himself drafted the documents that he claimed would accomplish this goal.

9.      As it turned out, Friedman's "belt and suspenders" gave Amusement none of what it expected and what he had promised.  In fact, Amusement would discover later that the belt and suspenders, like the original partnership Friedman pitched, was doomed from the beginning as it too violated the terms of the loan agreements – again, something Amusement did not know and that Friedman did not mention.  Moreover, the documents Friedman prepared as part of the new structure failed as well.  As just one example, a key component of the new structure was two promissory notes Friedman prepared that were to evidence a debt owed by Stern and Safrin to Amusement.  A court would later hold that both of the promissory notes were unenforceable and void because Friedman failed to have them delivered properly.

10.     Ultimately, Friedman released Amusement's $13 million without its required written consent and Stern and Safrin used the money to close the deal before Amusement had the documents it needed.  After the deal closed, it was only a matter of time before Amusement sued, or even worse, went to the police.  Stern and Freidman knew that the only way to cover up what had occurred was to find money to repay Amusement its $13 million.  As alleged in more detail

below, Friedman and Stern were so desperate to find this money before the truth came out that

the two counterfeited a key document and gave it to a third party lender to convince it to lend on

the transaction.  In the end, however, the efforts to find money to pay off Amusement failed and

Amusement not only lost all of its $13 million but the portfolio and its $60 million in equity as

well.

Parties

11.    Plaintiff Amusement Industry, Inc. is a California corporation doing business as

Westland Industries, duly organized and existing under the laws of the State of California, and

conducting business from its principal place of business in Long Beach, California.

12.    Upon information and belief, defendant Buchanan Ingersoll & Rooney P.C., is a

professional corporation, duly organized and existing under the laws of the State of

Pennsylvania, which maintains offices for the practice of law at 620 Eighth Avenue, 23rd Floor,

New York, New York 10018-1669.  Upon information and belief, at all times pertinent to the

allegations of this Complaint, Friedman practiced out of BIR's New York office.

13.    Defendant Stephen Friedman is a natural person who, upon information and

belief, is a citizen and resident of the State of New York.  Upon information and belief, Friedman

is an attorney licensed to practice in the State of New York and at all times pertinent to the

allegations of this Complaint, Friedman was an attorney at BIR where he held himself out as an

expert in the area of real estate acquisitions and finance.  At all times mentioned herein

Defendant Stephen Friedman was the agent, employee, and shareholder of Defendant BIR and in

doing the things herein alleged was acting within the scope of such agency and employment.

<u>Jurisdiction and Venue</u>

14.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

15.     Venue is proper herein pursuant to 28 U.S.C. § 1391(a)(1), in that at least one Defendant resides in this district and all Defendants reside in New York.

16.     Venue also is proper herein pursuant to 28 U.S.C. § 1391(a)(2), in that a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

<u>Facts Common to All Claims for Relief</u>

A.     <u>The Deal</u>

17.     Plaintiff is informed and believes, and on that basis alleges, that in April 2007 Mark Stern, through a corporation that he owned and controlled called First Republic Group Realty Corp., entered into an agreement to purchase a portfolio of ten shopping centers from Colonial for approximately $130,000,000.  Stern and Colonial later added another shopping center to the deal increasing the total number to eleven (collectively "the portfolio" or "the properties").  The portfolio consisted of retail shopping centers in Virginia, Georgia, Alabama, and North Carolina with an appraised value of approximately $190,000,000.  Sometime after First Republic Group Realty Corp. signed the purchase agreement with Colonial, Stern caused the corporation to assign the purchase agreement to a new entity called First Republic Group Realty LLC ("FRGR LLC").  FRGR LLC would ultimately become the purchaser of the portfolio and the borrower on the mortgage used to pay for it.

6

B.    The Original Partners

18.    Plaintiff is informed and believes, and on that basis alleges, that on or about May

1, 2007 Stern retained Friedman and BIR to represent himself and FRGR LLC in the deal and

that thereafter Friedman and BIR acted as counsel for Stern and FRGR LLC in the deal.  Plaintiff

is further informed and believes, and on that basis alleges, that on or about May 6, 2007

Friedman introduced Stern to Egert as a possible partner.  Egert was Safrin's son-in-law, a real

estate investor in his own right, and like Safrin, an existing client of BIR and Friedman.

19.    Upon information and belief, Egert evaluated the deal, liked what he saw, and

concluded that the project would make a lot of money.  Thereafter, Egert on behalf of himself

and Safrin, who he represented, agreed to become partners in the deal with Stern.  Plaintiff is

informed and believes, and on that basis alleges, that BIR and Friedman thereafter represented

Stern, Safrin, and Egert together in the transaction but did so without obtaining a conflict waiver

agreement.

20.    Plaintiff is informed and believes, and on that basis alleges, that Safrin and Egert

never intended to invest any cash into the deal.  Rather, Safrin and Egert obtained their share of

the partnership in exchange for Safrin sponsoring the deal.  Typically, lenders will agree to loan

on such large transactions only where at least one sponsor has significant financial wherewithal,

like Safrin, and also agrees to provide some form of limited personal guarantee to repay the loan.

The guarantees, often referred to as "carve outs" or "bad boy carve outs," obligate the guarantor

to repay the loan where certain types of events occur, such as when the borrower files for

bankruptcy, engages in fraud or waste, or obtains additional financing in violation of the original

loan agreement.  Plaintiff is informed and believes, and on that basis alleges, that Citigroup

would not have made the loans without Safrin acting as a sponsor and guarantor.

C.      The Citigroup loans

21.     In addition to recruiting investors for the deal, Stern also had to secure financing. Toward that end, Stern hired Northmarq Capital, Inc. and Richard Koch, one of its mortgage brokers, (jointly "Northmarq") to find him a loan. Northmarq ultimately secured two loans from Citigroup Global Realty Corp. ("Citigroup"), a first mortgage loan ("the mortgage") and a mezzanine loan ("the mezzanine"). The amount of the mortgage loan changed by the time the deal closed but originally was approximately $113,000,000 and the mezzanine loan was $15,000,000. (Hereafter the mortgage and mezzanine loans sometimes jointly referred to as "the Citigroup loans" or "the loans.")

22.     The Citigroup loans contained a number of specific provisions, including requirements on how ownership of the properties had to be structured. For example, the mortgage loan required that the borrower (FRGR LLC or the "Borrower") constitute a newly formed "single purpose entity" or "SPE." The loans also required that the Borrower must have as its controlling member another SPE. That entity, which also functioned as the mezzanine loan borrower, was First Republic Group Managing Member LLC (hereafter "Managing Member"). The structure up to that point looked as follows:



23.     To secure repayment of the mezzanine loan, Citigroup also required that the owners of Managing Member – Stern, Safrin, and Egert – cause Managing Member to pledge its shares in FRGR LLC to Citigroup as collateral.  Thus, if Managing Member defaulted on the mezzanine loan, Citigroup could foreclose on Managing Member's shares in the Borrower and thereby obtain control of the portfolio immediately because Managing Member owned the Borrower and the Borrower owned the properties.

24.     Plaintiff is informed and believes, and on that basis alleges, that Friedman knew or should have known about the Citigroup loan requirements and participated in structuring the ownership of the portfolio for Stern, Safrin, and Egert to comply with those agreements.  In doing so, however, Friedman completely ignored fitting Amusement into the ownership structure.  Friedman took the existing entities Managing Member, FRGR LLC, and FRGR Holdings LLC, and layered on top the Stern, Safrin, and Egert interests by forming two new entities called MS Colonial LLC and JSAE Colonial LLC.  Plaintiff is informed and believes, and on that basis alleges, that the "MS" in MS Colonial LLC stands for "Mark Stern" and the "JSAE" in JSAE Colonial LLC stands for "Joshua Safrin Avery Egert."  The entire ownership structure looked like this:



25.     As alleged in more detail below, the structure set forth above differed dramatically from the structure of the deal that Friedman promised Amusement.  Friedman had promised, and Amusement expected, that Stern, Safrin, and Amusement (Friedman never informed Amusement about Egert's participation in the deal) would form a new partnership owned 50/50 between Stern and Safrin on one hand and Amusement on the other.  That new partnership would, in turn, own the properties.  The Citigroup-required structure made the structure Friedman pitched to Amusement impossible, as Friedman knew or should have known.

26.     In addition to the structural requirements, the Citigroup loans also contained other provisions, including the following:

(a)     Mark Stern and Joshua Safrin, together, had to always control the Borrower, FRGR LLC, and own, directly or indirectly, 51% of the Borrower;

(b)     The Borrower was required to deposit all gross income from the portfolio into what the loan agreement referred to as a "lock box" account at Wachovia Bank;

(c)     The lock box account was "subject to the sole dominion, control and discretion" of Citigroup;

(d)     Mark Stern and Joshua Safrin had to sign so-called "bad boy carve out guarantees" which created exceptions to the non-recourse provisions of the loans ("the carve outs");

(e)     Stern and Safrin had to make a significant cash equity contribution which by some estimates was approximately $26 million;

(f)     The loan agreement provided that Jones Lang LaSalle, which was the existing property management company, could not be terminated without Citigroup approval;

(g)     Citigroup had to approve any change in the ownership structure of the portfolio;

(h)     The Borrower (FRGR LLC) could not encumber the properties, place liens on the properties, or transfer any of the properties without Citigroup's approval; and

(i)     Stern's and Safrin's ownership entities, MS Colonial LLC and JSAE Colonial LLC, could not assign their interests.

D.      Friedman's misrepresentations

27.     Plaintiff is informed and believes, and on that basis alleges, that even with a Citigroup loan commitment Stern could not do the deal without additional cash, which it appears Safrin and Egert would not agree to provide.  That is where Amusement came in.  Amusement is a closely held corporation owned by Allen Alevy and other members of Alevy's family.

Amusement is a diversified real estate investment, development, and management company, with interests in mobile home parks, apartment buildings, shopping centers, and industrial and commercial properties. With limited exceptions, Amusement has the bulk of its holdings in Southern California. This concentration of holdings in Southern California reflects Alevy's business philosophy of focusing on parts of the country with which he has experience.

28.     Friedman introduced Stern to Alevy's son Steven Alevy, who was a commercial mortgage broker, ostensibly to help Stern find a loan to buy the portfolio. Plaintiff is informed and believes, however, that in reality Friedman knew that Stern already had a mortgage broker and used Steven Alevy to get to Amusement's money.

29.     Initially, Alevy passed on the deal when Friedman presented it to him. He did not know Stern or Safrin personally, was somewhat uncomfortable investing in out-of-state properties, and did not like partnerships generally. To overcome this reluctance, in mid to late-June and early-July 2007, Friedman made a number of representations to Alevy over the telephone, all of which turned out to be false or misleading, to induce Alevy to invest in the deal. Those representations included, but were not limited to, the following:

(a)     That the proposed 50/50 partnership between Amusement, Stern, and Safrin was possible under the terms of the Citigroup loan agreements;

(b)     That Safrin had put up and was putting up much of the equity for the deal;

(c)     That Safrin had already put $26 million into escrow for the deal but needed to take out half his money for another real estate transaction;

(d)     That Amusement could not own 51% of the to-be-formed Stern/Safrin/Amusement partnership because if Amusement owned more than 50% Alevy would need to sign the carve outs;

(e)     That Friedman would "protect" the Alevy family;

(f)     That the bookkeeping, banking, and check writing functions for operation of the shopping centers would take place in Long Beach, California;

(g)     That revenues from the portfolio would be deposited into Farmers & Merchants Bank, which was Amusement's longtime California bank;

(h)     That the new partnership could terminate the existing property management company "immediately;" and

(i)     That the escrow company to which Friedman directed Amusement to wire its funds was a branch office of a national title company.

30.     As alleged in more detail below, Freidman's representations concerning the nature of the deal, its terms, and the players were false, misleading, or incomplete. Friedman made these representations to Alevy and either knew or should have known them to be false, misleading, and incomplete. Moreover, Friedman made these representations to Alevy knowing that each was a material point to Alevy who would not have gone forward with the deal had he known the truth. The most significant example being that the 50/50 partnership Friedman proposed to Amusement in exchange for its $13 million – the very essence of the deal from Amusement's perspective – was expressly prohibited by the clear and unambiguous terms of the Citigroup loan agreements. Needless to say, this was a key fact that Friedman knew or should have known but failed to disclose.

E.     The LOU

31.     In reliance on Friedman's false, misleading, and incomplete statements, Alevy eventually agreed in principle to join the venture with Stern and Safrin, but Alevy still wanted some form of a written agreement before wiring Amusement's funds. Friedman responded by

offering Alevy a letter of understanding ("LOU") and promised Alevy that a formal written agreement would follow. Friedman dictated the bulk of the LOU's key terms and contents to Steven Alevy and another employee of his company, one of whom then typed it and sent it to Friedman for his review, prior to sending the LOU to Stern. Thereafter, on or about July 2, 2007, Stern signed the LOU, which set forth the nature of the partnership and a framework for the parties to attempt to reach a final partnership agreement.

32.     Among other things, the LOU reflected Friedman's representation that Amusement would become 50/50 partners with Stern and Safrin in the portfolio. The LOU also provided for a 7-day period during which the parties would attempt to negotiate a final partnership agreement. To give Alevy further comfort, Friedman offered to act as a mediator between the partners if disputes arose, and Stern added a handwritten note to that effect into the LOU. No one from Amusement ever signed the LOU. A true and correct copy of the LOU is attached hereto as Exhibit A and incorporated by reference.

F.     <u>The escrow</u>

33.     In reasonable reliance on the LOU and on Friedman's false, misleading, and incomplete representations and assurances, on or about July 2, 2010 Amusement wired $13 million as its share of the partnership into what Friedman had said was a reputable, national escrow company. Amusement did so solely on Friedman's direction and without any formal written escrow instructions governing the release of the funds beyond Friedman's agreement to not release the funds without Amusement's permission. When Amusement hesitated to wire the money, Friedman assured it that the company, Land Title Associates ("LTA"), was the same escrow company Citigroup had agreed to use for its own money in the deal, which gave Amusement additional comfort.

34.     In truth, LTA was neither a national title company nor a national escrow company.  In fact, it was not a title company or escrow company at all, but rather a series of bank accounts opened by Frenkel, a previously-disbarred New York attorney.  Had Friedman told Amusement the truth about Frenkel, Amusement would never have transferred its funds in the first place.  Frenkel has since been indicted for fraud for his role in the Colonial Transaction.

G.     Friedman is on all sides of the deal

35.     Friedman told Amusement and others that he represented both Stern and Safrin in the deal.  As such, following the transfer of its funds to Frenkel, Amusement directed Friedman, who it believed was its attorney in the deal, to work out a partnership agreement with Stern and Safrin.  Although Amusement believed that BIR and Friedman also represented it in the deal, Amusement used its in-house legal staff where it could to save on fees.  Amusement's in-house lawyers, however, could only do so much.  The Amusement attorneys were not in New York, had limited transactional experience, and had no experience in deals of this size or complexity.  Moreover, Friedman was the only attorney with access to the key deal-related documents and players.  In short, Amusement believed that Friedman was acting as its lead lawyer with its in-house staff helping where they could.

36.     One of Amusement's in-house attorneys prepared draft partnership agreements to reflect the 50/50 partnership Friedman presented to Amusement and the other key deal points Alevy had wanted and to which Friedman, on behalf of Stern and Safrin, had agreed.  These agreements reflected Alevy's clear, but as Friedman knew, mistaken understanding of the deal and the partnership.  Amusement forwarded a total of three agreements to Friedman for review and comment, but each met mainly with silence.  Friedman would later admit under oath that he did not even bother to read them all.

37.    With no written partnership agreement in hand and unclear about just how it would own 50% of the portfolio, on or about July 6, 2007 Amusement demanded its money back. Friedman, however, advised Alevy not to withdraw the funds, counseling that if Alevy did so, he would be in breach of the LOU and Stern and Safrin would sue him for $60 million (the difference between the portfolio's purchase price of approximately $130 million and its then-appraised value of $190 million). Friedman's advice, in reality, was false and given without any good faith basis solely to hold the deal together for the benefit of his two other clients.

38.    As the transaction progressed, Amusement became more than concerned about the lack of a signed partnership agreement. Although Friedman had vouched for Stern's integrity and Amusement knew of Safrin, it still wanted a signed agreement. In the course of trying to work out the partnership's structure, on or about July 9, 2007, one of Amusement's in-house attorneys asked Friedman to have the purchase agreement with Colonial assigned to the to-be-formed Stern/Safrin/Amusement partnership. From Amusement's perspective, the request was entirely reasonable because at that point, even though it had put up its money, on paper Amusement owned nothing.

39.    Rather than agreeing to the requested assignment as one might expect – since an assignment was one of the only logical means by which Amusement could have received what it bargained for – Friedman responded angrily saying, "Are you kidding? That is not going to happen. . . . It is beyond late in the game to even think about having the purchase agreement assigned." Understandably confused, Amusement's in-house attorney asked the only logical follow-up question, "[Then] [h]ow do you intend to get [Alevy] his 50% [of the portfolio ?]" Friedman's response: Silence.

40.     The lack of a signed partnership agreement, however, was not the only problem hanging over the deal.  In fact, Friedman had not disclosed other key facts that he knew or should have known.  For example, Friedman had told Amusement that Citigroup was also using Frenkel as its escrow holder – a ringing endorsement from a Fortune 100 company.  Friedman failed to mention, however, that Citigroup changed its mind about using Frenkel.  As another example, Citigroup expressed concern that Stern was pocketing money from the deal – again, something that Friedman failed to mention.  With these and other clouds hanging over the transaction, with no written signed partnership agreement, no written escrow instructions, and no way to protect its funds, Friedman nonetheless advised Amusement not to withdraw its funds.

H.      "Belt and suspenders"

41.     As Amusement's demand to have its $13 million returned threatened to unravel the deal for Stern and Safrin, Friedman tried desperately to hold it together.  Amusement is informed and believes, and on that basis alleges, that Friedman was under great pressure from BIR to generate revenue.  In fact, Amusement is further informed and believes that BIR hired Friedman, a rabbi, specifically to target business in the Jewish community and Friedman knew that if the deal fell apart he would have a much harder time generating business and BIR would have a much harder time getting paid.

42.     At the same time that Friedman tried to scare Amusement with the specter of a $60 million lawsuit, he also tried to buy more time by offering to restructure the transaction in a way that, he claimed, would fully protect Amusement's funds (hereafter the "Revised Deal Structure").  Friedman described this new structure as "belt and suspenders" and told Allen Alevy on or about July 9, 2007 that it would make Amusement an "owner" and put it in an even more secure position than Citigroup.  Friedman further agreed to draft the documents necessary

17

to effectuate the goals of the Revised Deal Structure. Based on Friedman's advice and his representation that he would protect Amusement's interests, Amusement did not immediately withdraw its funds from escrow when it had the chance.

43.     Under Friedman's Revised Deal Structure, the goal as he presented it to Amusement was to transfer ownership and control of the portfolio to Amusement immediately while Stern and Safrin tried to raise money to repay Amusement $13 million or $15 million. Depending on how much Stern and Safrin raised, then they would regain some or all of the portfolio. And if they could not pay either the $13 million or $15 million, then Amusement would keep 100% of the properties.

44.     To accomplish the Revised Deal Structure, Friedman drafted assignments that purported to assign Stern's and Safrin's respective interests in MS Colonial LLC and JSAE Colonial LLC to Amusement – in theory giving Amusement control and ownership of FRGR LLC. That was the belt. He also had FRGR LLC, through Stern, sign warranty deeds one for each of the 11 properties in the portfolio directly to Amusement. That was the suspenders. Amusement thereby expected to both own the properties outright and to own the entities that owned the properties outright. As alleged below, it got neither.

45.     In addition to the assignments and warranty deeds, Friedman also prepared two promissory notes, one for $13 million and one for $15 million with both due in 60 days, which were to function as part of the overall structure and protect Amusement. Under the plan, if Stern and Safrin paid off the $13 million note, they would become 50/50 partners with Amusement in FRGR LLC. If they paid off the $15 million note, then Stern and Safrin would keep the entire portfolio and Amusement would walk away. If they did not pay off either note within the 60 days, then Amusement would retain 100% ownership of FRGR LLC.

I.      Release of Amusement's funds

46.     Prior to July 9, 2007, Amusement had given Friedman sole authority over release
of the $13 million in escrow.  Amusement did so believing that Friedman and BIR were
representing it in the deal and that they would not release the funds without ensuring that
Amusement was fully protected.  On July 9, 2007, however, as Amusement became more
concerned about the safety of its funds it changed its mind and specified that the funds could
only be released upon the written authority of Allen Alevy or one of his in-house attorneys Allen
Sragow.

47.     On or about July 12 and 13, 2007, Friedman emailed to Amusement copies of
various documents he had prepared in connection with the Revised Deal Structure.  The
documents included the two promissory notes, an assignment signed by Mark Stern for MS
Colonial LLC, an assignment purportedly signed by Safrin for JSAE Colonial LLC, an "escrow
agreement" signed by Mark Stern, and 11 warranty deeds signed by Stern, one for each property
in the portfolio.  The documents, however, were incomplete.  For example, Amusement
expected, but never received, promissory notes signed by Safrin.

48.     On July 12, 2007, without Amusement's knowledge or authorization, and in direct
defiance of Amusement's instructions otherwise, Friedman told Frenkel over the telephone that
Frenkel could release Amusement's $13 million from escrow.  Pursuant to Friedman's direction,
Frenkel then proceeded to release Amusement's funds.

49.     On July 13, 2007, at approximately 11:19 a.m., Friedman then "bcc'd" Frenkel on
an email to Amusement that stated, in part, "I HAVE ALL THE DOCUMENTS" and "YOU
CAN RELEASE THE ESCROW."  Friedman sent this email authorizing the release of the funds
for a second time knowing both that he had no authority to do so and, even more importantly,

19

knowing that he had already told Frenkel to release Amusement's money and that the

"DOCUMENTS" were incomplete and essentially worthless.  As it turned out, a significant

portion of Amusement's funds had already been disbursed after Friedman's telephone call with

Frenkel on July 12, 2007, something that Amusement did not learn until about a year later.

Some of the funds were used in connection with the portfolio purchase while much of it was

simply converted and traced to Stern and others.  Amusement at no time authorized the release of

all or any part of the funds.

        J.       <u>The BIR/Amusement attorney-client relationship</u>

        50.      BIR and Friedman concede that during the same period as the Colonial Deal they

represented Amusement on another New York real estate transaction involving the purchase of

an office building located at 123 West 79th Street (the "79th Street Transaction").  Although

Allen Alevy's son Steven Alevy signed the retention agreement and the original purchase

agreement for the building, Steven Alevy assigned the purchase agreement to Amusement almost

immediately and BIR knew that the actual purchasers were Amusement and another

Amusement-controlled entity.

        51.      BIR and Friedman knew about the Steven Alevy-Amusement assignment and

treated Amusement as if it were the client in all respects.  For example, the 79th Street

Transaction closing binder, which BIR and Friedman prepared, listed 6665 Long Beach Blvd.,

Long Beach, California – *i.e.*, Alevy and Amusement's offices – as the principal buyer's address.

Alevy was also named in connection with a loan assumption for the purchase.  Friedman

communicated directly with Alevy to keep him apprised of the deal's progress.  When Friedman

needed permission or authority for the 79th Street Transaction he went to Alevy or one of

Amusement's in-house attorneys.  For example, on June 27, 2007, Friedman sought approval of

an expense related to the 79th Street Transaction, not from Steven Alevy, but from Amusement directly. Friedman also held himself out to others as Amusement's attorney, referring to Alevy as "my client" in an email with the attorney for the seller.

52.    Just as it did in the 79th Street Transaction, Amusement looked to Friedman for legal advice and guidance on the Colonial purchase. For example, on July 6, 2007 Alevy wrote to Friedman about *both deals* reminding him that Amusement had "never done a closing in New York," asking about how rent credits will be applied, and asking Friedman to explain the transaction to one of Amusement's in-house attorneys. Alevy believed that Friedman was acting as its attorney in both transactions as did all of Amusement's in-house California attorneys. In fact, on June 27, 2007 one of Amusement's in-house attorneys specifically referred to Friedman as "our New York attorney."

53.    For their part, BIR and Friedman played the role of Amusement's attorney to a "T." Friedman communicated with and provided advice directly to Alevy on both transactions without any other attorney present – something he would not have done, and ethically could not have done, if he believed Amusement was represented by counsel other than himself. In fact, Friedman bypassed, and at times outright ignored, disparaged, and diminished, Amusement's in-house attorneys. And like the 79th Street Transaction when Friedman needed approvals from the client on the Colonial Deal, he went to Amusement directly.

54.    One of the more significant examples of Friedman providing legal advice to Amusement came when he advised Allen Alevy that Amusement could not – and should not – remove its $13 million from escrow, advice Amusement followed. Amusement also, at least initially, gave Friedman control over the release of its funds and agreed that he would act as a binding mediator for disputes between Amusement and its partners – significant powers that no

21

client would have given to someone other than its own attorney, let alone to an adversary's attorney. And it was Amusement's in-house counsel who relied on Friedman to answer one of the central legal questions in the Colonial deal – "How do *you* intend to get [Alevy] his 50% [of the portfolio ?]" At no time did Friedman ever tell Alevy, or any Amusement employee, that he was not Amusement's attorney in the Colonial Deal.

55.     Friedman knew, or at a minimum should have know, that Amusement believed he was acting as its attorney because without Friedman it was as if Amusement had no attorney at all – something unthinkable in a transaction of this size and complexity. That is because only Friedman, as opposed to Amusement's in-house attorneys, had access to the key deal documents, information, and players without which it would have been impossible for Amusement's in-house attorneys to represent Amusement competently. Moreover, only Friedman had the type of real estate experience and expertise necessary to close such a large, complex deal. Regardless, Defendants now deny that they acted as Amusement's counsel in the Colonial Deal at any time.

K.     "DOA"

56.     Friedman claimed that the documents he prepared under the Revised Deal Structure would fully protect Amusement's interests – and as alleged above make Amusement the "owner" of the portfolio. Just as Amusement relied on Friedman in believing that the original 50/50 partnership was possible so too did it rely on this claim. In reality, both of the deals that Friedman proposed, whether the original 50/50 partnership or the Revised Deal Structure, were dead on arrival because each violated the clear and unambiguous terms of the Citigroup loan agreements and the documents Friedman prepared failed to give Amusement what it was promised.

57.     In this light, Friedman's statement to Amusement on July 9, 2007 that insufficient time existed to form a partnership with Amusement was clearly misleading and intended to stay Amusement's hand.  In reality, all the time in the world would not have altered the terms of the Citigroup loans.  And so when Amusement asked for a copy of the Citigroup loan documents on that same day, Friedman falsely responded in writing, "I don't have the docs," knowing full well that once Amusement saw them the deal was over and Amusement would pull its funds.  In truth, Friedman had received copies of the Citigroup loan documents at least as early as June 19, 2007 but kept them from Amusement.

L.     Friedman's "belt and suspenders" falls down

58.     As alleged above, Friedman proposed the Revised Deal Structure, or as he called it the "belt and suspenders," as a means of convincing Amusement to keep its money in the deal. He represented that the new structure would fully protect Amusement and result in either Amusement getting its money back or in Amusement getting 100% ownership and control of the portfolio if Stern and Safrin failed to pay the $13 million or $15 million within 60 days.  As it turned out, Amusement got neither.

59.     The assignments Amusement received were worthless.  The JSAE Colonial LLC assignment did not bear Safrin's true signature, something Friedman who was in charge of getting Safrin's signatures surely knew or should have known.  Just as startling, Egert, who unknown to Amusement also owned a part of JSAE, had not signed the assignment at all; again something Friedman certainly knew or should have known would be necessary to make the assignment valid and that Amusement had no way of knowing.  Friedman also failed to disclose that Stern and Safrin had already pledged the shares of Managing Member to Citigroup as security for the mezzanine loan, thus changing the nature of the MS and JSAE assignments

23

completely. The Friedman-prepared warranty deeds faired no better and were ultimately worthless.

60.     Lastly, the promissory notes failed as well. First, Friedman did not have the signed notes properly delivered to Amusement, something Friedman as an experienced real estate attorney would have known he needed to do to make them enforceable. As a result, the court in *Amusement v. Stern, et al.*, Civ. No. 07-11586 (S.D.N.Y.) dismissed causes of action for breach of the notes for lack of delivery. Second, and more significantly, Friedman omitted critical language from the promissory notes necessary to make it clear that Amusement would own FRGR LLC if Stern and Safrin defaulted under the promissory notes, which they did. Without that critical language in the notes , Amusement ended up with two worthless promissory notes and no ownership in FRGR LLC.

61.     In the end, Friedman's Revised Deal Structure failed completely to accomplish any of Amusement's goals. Amusement did not end up owning the properties in the portfolio. Amusement did not end up owning or controlling the entities whose interests were purportedly assigned to it. And Amusement's claims based on the notes were dismissed. Amusement lost its $13 million, it lost the value of the two promissory notes, and it lost the portfolio, which by Friedman's own estimates had approximately $60 million in equity that Amusement should have owned outright.

M.     The cover-up

62.     After the deal closed using Amusement's and Citigroup's money, Stern and Friedman still had one remaining problem: Sunshine. They needed to prevent any light from shining down on the transaction and exposing the fraud on Amusement and Citigroup – the same fraud alleged in the indictment against Frenkel – and other problems with the deal. Both

Friedman and Stern knew that it was only a matter of time before Amusement figured out that the pile of documents Friedman left it holding was worthless and went to the police. They also knew that it was also only a matter of time before Citigroup, which had put up approximately $128 million, realized that it too had been defrauded.

63.     Shortly after the deal closed on or about July 13, 2007, Alevy was understandably upset about the release of Amusement's funds without his authorization. He spoke to Friedman and threatened to go to the police to report the matter as a theft of Amusement's $13 million. Friedman knew that if Alevy did so not only would the transaction unravel but, as alleged above, Amusement would figure out that he had misled it about the deal. So to buy additional time, Friedman stepped in again, but this time mainly to protect himself and BIR from the fallout of the fraud.

64.     Just as he had raised the specter of a $60 million lawsuit to stay Amusement's hand and hold the deal together before, he played the fear card one more time. This time he warned that if Alevy went to the police a lot of religious Jews would go to jail, including Alevy's only son Steven. While Friedman clearly fabricated the claim about Steven Alevy, the other prediction appears to be coming true in light of the Frenkel indictment. Later, Friedman would say about his own involvement in the deal that "being disbarred is the least of my worries," strongly suggesting that he knew about a fraud and may have taken part in it himself.

65.     Friedman convinced Alevy to delay going to the police and filing a lawsuit while he (Friedman) worked to settle the matter and get Amusement's money back. Plaintiff is informed and believes, and on that basis alleges, that now having bought themselves more time, Friedman and Stern knew that to cover up the problems with the deal they needed money to pay Amusement back, and quickly. They believed, wrongly it turned out, that with Amusement out

of the deal no one would see the myriad irregularities that have since come to light, including the use of fraudulent deal expenses and forged invoices that are alleged in the indictment against Frenkel.

66.     To pay back Amusement, Stern and Friedman needed to find a new, larger mezzanine loan and so beginning in or about July and August 2007, Stern and Friedman approached Petra Capital ("Petra"), a private equity lender, to obtain the new loan.  Stern would take $15 million from a new loan to repay Amusement and Amusement would walk away from the deal.  The Petra loan appeared to be one of a very small number of prospects for the loan they needed so Stern and Friedman did all they could to secure the new loan.  In fact, as alleged below, the two were so desperate to get the Petra loan that they counterfeited a key document and give it to Petra.

67.     Specifically, during the Petra loan process, Petra asked Stern and Friedman to describe the nature of Amusement's interest in the portfolio.  Initially, Stern described Amusement's interest as "preferred equity."  Doing so created a problem, however, because Citigroup knew nothing about Amusement's participation in the deal.  Amusement would come to learn later that Friedman had concealed Amusement's presence in the deal from everyone, including other lawyers, Colonial, and most significantly Citigroup itself.  In fact, if Amusement did hold a preferred equity position, it may have violated the terms of the loan agreements.

68.     So to avoid a possible default under the loan agreements and to avoid having to answer a host of troubling questions, Friedman simply told Petra's attorney that Amusement's interest was not preferred equity but rather a $15 million convertible debenture – i.e., a promissory note evidencing a loan to Stern that upon default would convert *pro rata* into an equity ownership interest in FRGR LLC (the portfolio owner).

26

69.     The convertible debt interest Friedman described to Petra was, in reality, close to what Friedman had promised Amusement in the first place under the Revised Deal Structure – *i.e.*, if Stern and Safrin did not pay Amusement either $13 million or $15 million in 60 days then Amusement kept the portfolio.  But Friedman had one problem with the story he told Petra:  The original promissory note that he prepared, that Stern signed, and that he emailed to Amusement did not contain critical language necessary to make it a convertible note.  Recognizing that what he told Petra and what the note provided did not match, Friedman counterfeited a second note.  Stern signed the counterfeit note and another BIR attorney emailed it to Petra.

70.     The counterfeit note differed from the actual note in several ways.  For example, the interest rates in the two notes did not match and blanks in the original note had been filled in for the counterfeit note.  But the most important difference between the two notes was that the counterfeit note contained the missing convertible note language that Friedman should have included, but omitted, from the original.  The last page of the two notes, which are attached in full hereto as Exhibits B and C and incorporated by this reference, appear side-by-side as follows:

27

ORIGINAL NOTE                    COUNTERFEIT NOTE

71.     In the end, Petra would not give Stern the loan.  As a result, Amusement did not get any of its money back, the documents Friedman prepared failed to achieve Amusement's goals and his promises, and Amusement lost both its $13 million investment and the entire portfolio and its $60 million in equity.

<u>First Claim for Relief</u>
(Attorney Malpractice – Against All Defendants)

72.     Plaintiff repleads and realleges the allegations stated in paragraphs 11 through 71 of this Complaint as if stated in full.

73.     As alleged herein, and at all relevant times relevant hereto, an attorney-client relationship existed between Amusement, on the one hand, and Defendants BIR and Friedman, on the other hand, to represent Amusement in connection with the Colonial Transaction.

74.     By virtue of the attorney-client relationship that existed between Amusement and Defendants and the relationship of trust and confidence that existed between them, BIR and Friedman had an obligation to perform their services and to represent Amusement in a skillful, proper, ethical, and diligent manner consistent with the professional standards of competence and expertise that would be employed by attorneys that specialize in real estate transactions similar in size and complexity to the Colonial Transaction.

75.     Defendants BIR and Friedman, and each of them, failed to exercise reasonable care and skill expected of a member of the legal community in general, and the degree of care, skill, and diligence expected of a member of the local legal community specializing in corporate law and commercial real estate transactions and negligently, carelessly, maliciously, wantonly, and recklessly represented and advised Amusement in connection with the Colonial Transaction by, among other things, the following:

(a)     Representing Amusement in the Colonial Deal while purporting to also represent Stern and Safrin without advising Amusement that its interests in the deal were potentially adverse to Stern's and Safrin's;

29

(b)      Representing Amusement in the Colonial Deal while purporting to also represent Stern and Safrin without obtaining a written waiver of potential conflicts of interest, as required by New York State Bar Rules of Professional Conduct, from Amusement, Stern, or Safrin;

(c)      Concealing the fact that Friedman had never actually spoken to Safrin about the Colonial Deal;

(d)      Concealing that Citigroup had changed its mind about using Frenkel and LTA as the escrow for the deal;

(e)      Concealing that Frenkel was not the manager of a national escrow and title company;

(f)      Concealing that Egert, Safrin's son-in-law, was a partner in the deal;

(g)      Concealing the terms of the Citigroup loan documents by Friedman falsely claiming that he did not have a copy when Amusement asked for one;

(h)      Concealing that Egert was a member of JSAE Colonial LLC;

(i)      Concealing that Citigroup had concerns about Stern taking a portion of the loan proceeds for himself;

(j)      Concealing that Citigroup had reduced the amount of the loan to Stern due to concerns about whether Stern was pocketing part of the loan proceeds and questionable expenses;

(k)      Concealing that under the terms of the Citigroup loan documents the Amusement/Stern/Safrin partnership could not terminate the existing property manager for the portfolio as Amusement had requested;

(l)      Concealing that Managing Member had already pledged its shares in First Republic Realty Group LLC to Citigroup as collateral for the mezzanine loan;